COURT OF APPEALS OF VIRGINIA

Present:   Judge Clements, Senior Judges Willis and Annunziata
Argued at Alexandria, Virginia


ANTONIO L. DAVIS, SR.

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0966-05-4                      JUDGE JERE M.H. WILLIS, JR.
                                                        NOVEMBER 1, 2005
J.D. LITTLEJOHN, INC. AND
 UNINSURED EMPLOYER'S FUND


FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

Christopher P. Schewe for appellant.

No brief or argument for appellees.


Antonio L. Davis, Sr. appeals a decision of the Workers' Compensation Commission

denying his change-in-condition claim seeking an award of temporary total disability (TTD)

benefits, and granting the application of the Uninsured Employer's Fund (the Fund) to suspend

or terminate his outstanding award of compensation benefits.  He contends the commission erred

in finding that he failed (1) to cooperate with vocational rehabilitation efforts; and (2) to prove he

sustained a compensable change in condition as of June 28, 2004.  Finding no error, we affirm.

BACKGROUND

On appeal, we view the evidence in the light most favorable to the prevailing party

below.  R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990).

On June 13, 2001, Davis sustained a compensable back injury while working for J.D.

Littlejohn, Inc. (employer).  The commission entered an award for the payment of medical

benefits and TTD benefits beginning June 23, 2001.  On August 29, 2001, after determining that

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

employer was uninsured at the time of Davis's accident, the commission entered an award against the Fund.

On April 2, 2004, the Fund filed an application asking the commission to suspend or terminate Davis's outstanding award of compensation due to his refusal of selective employment and/or his failure to cooperate with vocational rehabilitation efforts. On August 6, 2004, Davis filed an application alleging a change in condition and seeking an award of TTD benefits beginning June 28, 2004.

At the hearing on those applications, Marie Graham, a case manager with Employment Rehabilitation Services, Inc., testified that she had worked with her manager, Cathy Woldanski, on Davis's case in an effort to find him alternative employment within his restrictions as set forth by Dr. Eric G. Dawson, his treating orthopedist. After conducting an initial interview with Davis on December 10, 2003, Graham developed a rehabilitation plan. Between December 2003 and April 2004, she met with Davis at least fifteen times. She testified that he had "a lot of transferable skills" and that he had an Associate's Degree in computer information systems. However, she noted that he could not "put that degree to work" because he lacked certification in various computer applications. She testified that he also had a commercial driver's license.

During the time Graham worked with Davis, she contacted at least 100 employers on his behalf. However, Davis told her that he did not feel he was capable of returning to work because he had been out of work for two years and because of his injury. Graham testified that when employers contacted Davis, he "would tell them what he couldn't do, [and] then they would say, well, I don't think this position is suitable for you." Because of this, she instructed him to promote his strengths.

Describing her efforts with respect to particular jobs, Graham testified that she set up an interview for Davis with C & J Transfer for a driver position. The interviewer came from

Maryland to interview Davis. The interview went well. However, because Davis lacked tractor-trailer experience, he did not get that job. Davis then interviewed with Target for a loss prevention job, but was put on a waiting list. He interviewed for a position with Potomac News. Following that interview, Graham learned that the employer understood that Davis could not perform the job because it required, *inter alia*, driving, bending, stooping, and Saturday work. Davis told the interviewer that he "wanted a job that was indoors with no weekends and . . . close to his pre-injury job amount . . . ." Davis told Graham he wanted a job with little physical activity and refused to work weekends because he had custody of his son. Graham testified that Davis did not get the job with Potomac News because "he didn't fit the profile and [the employer] didn't feel he could perform the duties . . . ."

Graham then investigated a job for Davis with the Prince William School District as a bus driver. Dr. Dawson had approved that position. Graham testified that Davis did not timely submit the required addresses of his previous employers or the paperwork on his character witnesses. When Mr. Poulson of the Prince William School District interviewed Davis and asked him if he felt he could do the job, Davis "shrugged" and said, "I guess so." In addition, Graham noted that Davis made negative comments about his medical condition to Poulson. When Graham discussed that interview with Davis, he told her that he did not know whether he could handle driving children. At the time of the hearing, that job was "still in the works," because Poulson was having problems obtaining responses from Davis's prior employers.

Graham tried to help Davis obtain a job as a delivery driver for Flower Gallery. That interview was scheduled for 9:30 a.m. Graham arrived at 9:15 a.m. Davis was already there. He had already been interviewed, and was completing an application. When Graham asked the interviewer how the interview had gone, she learned that Davis had stated that he was not interested in the position because it involved weekend work. After the interview, Davis told

Graham he would prefer not to have a driving position because he did not believe he could sit for long periods of time.

Graham helped Davis apply for a job as a warehouse clerk for U.S. International, a job that involved completing paperwork. Davis again arrived early for the appointment. While he and Graham were waiting for the hiring manager, they spoke with the receptionist about the position. When the receptionist mentioned that Davis might have to lift a case of paper, he put his hand over his mouth and said, "no, not I," and then slouched in his chair. When the hiring manager arrived, he spoke to the receptionist in his office. When the receptionist exited the hiring manager's office, she told Davis and Graham that the hiring manager had decided not to proceed with the interview. At some point, U.S. International added being a forklift operator to that job. Davis told Graham he preferred not to work on a forklift.

Graham told Davis to complete at home an application for a job with Home Depot. When Graham checked, Davis had not submitted the application. The next time Graham met with Davis, they completed the application together. At that time, Davis told Graham he had been unable to complete the application due to computer problems.

Davis failed to appear for an interview for a job as a security guard with U.S. Security at GEICO's business location. He claimed car problems. The interview was not rescheduled because Davis would have been required to drive to Chester, Virginia, and he told Graham that he would prefer not to drive that far. Graham did not "press the issue of having to drive an hour and a half for interviews."

On cross-examination, Graham acknowledged that she was aware that Davis had custody of his son on the weekends. She testified that she reviewed the driver positions at Flower Gallery and with Prince William School District with Dr. Dawson, who said claimant could perform those jobs. Graham thought that Davis had stated during the Flower Gallery interview

- 4 -

that he did not want that position because that employer did not provide health insurance. With respect to the weekend requirements for the GEICO job, Graham stated that she explained to Davis that the job required he work a Saturday or Sunday every other week when he first began employment and that every six weeks thereafter he could request a shift change.

Cathy Woldanski, manager of Employment Rehabilitation Services, Inc., testified that she had assigned Graham to work with Davis, that she met with Davis and Graham during the initial interview, and that she spoke over the telephone with Davis approximately four times after that. In those conversations, Davis informed Woldanski that car problems prevented him from appearing for the U.S. Security job interview and that he had rejected the GEICO job because he was not interested in weekend work. He agreed to interview a second time for the GEICO job, and did so. In late March 2004 or early April 2004, Davis called Woldanski and told her he was unhappy that his benefits were being terminated. He asked Woldanski if her company had told the Fund that he was not cooperating with vocational rehabilitation. Based upon her interactions with Davis, Woldanski believed that he did not want to return to work.

Susan Richardelli, a senior claims employment specialist for GEICO, who specializes in interviewing applicants for the claims department, testified that Davis completed an application for employment with GEICO on February 25, 2004. Richardelli testified that on March 1, 2004, her co-worker, Shane Roberts, asked Davis "standard questions of the career capability screen" over the telephone. When Roberts reviewed the hours to be worked, Davis said that he could not work weekends and withdrew his application. Davis contacted GEICO again on March 11, 2004 and spoke with Richardelli. At that time, he said he would work on weekends. When Richardelli asked him why he could then do so, he replied, "I guess I have to come in for the interview and work around it." Richardelli described Davis as being "very vague." When she asked him why he was interested in GEICO, he responded, "[Ms. Graham] sent my resume. I'm

just going out on interviews." At that point, Richardelli believed that Davis was not interested in the job and removed him as a candidate for a job in the claims department. She testified that he presented himself as unprofessional and uninterested, and as "somebody who is going through the steps." Davis later called Richardelli and asked what she had said to Graham, saying that "they were trying to take his workers' comp away." Richardelli referred Davis to Graham and had no further contact with him.

Davis testified that he has custody of his five-year-old son on weekends, but denied that he ever rejected any potential job due to a desire not to work on weekends. He claimed he told Graham he could adjust his schedule to accommodate working every other weekend as required in the GEICO job. He admitted that he had expressed concern about driving positions, but denied he ever said he would not accept those jobs.

Dr. Dawson began treating Davis on June 21, 2001. He prescribed therapy and medication for Davis's back injury and recommended that he remain off work. Dr. Dawson diagnosed Davis as suffering from lumbar discopathy and L5 neurosensory myelopathy. He excused Davis from working throughout the remainder of 2001 and into 2002. In a December 4, 2002 letter, Dr. Dawson opined that Davis would not be able to return to his pre-injury work, but that "[l]ight or modified duties" might be possible for him. Dr. Dawson suggested that Davis undergo vocational rehabilitation in order to find suitable employment.

On April 2, 2003, Dr. Dawson noted that Davis should remain at a "semi sedentary status." He signed a prescription slip dated April 30, 2003 stating that Davis would undergo a functional capacity evaluation (FCE), but that he should avoid stooping and bending.

The June 5, 2003 FCE indicated that Davis was capable of working at the "Light Medium" level with no lifting in excess of thirty-five pounds, but involving frequent sitting, standing, kneeling, reaching, stair climbing, and ladder climbing. The evaluator recommended

that Davis "return to gainful employment, full duty, per the above mentioned physical capabilities."

Notwithstanding the results of the FCE, Dr. Dawson continued to advise that Davis remain off work in September, October, and November 2003. On December 22, 2003, he reported that Davis had returned for follow-up with a rehabilitation specialist. He opined that Davis's recovery had reached a "plateau phase." He recommended vocational rehabilitation to try to increase Davis's activity level "both at work and to other ADL's." He issued a work status slip stating that Davis was able to return to work effective December 22, 2003, "[b]ased on FCE EVAL 6/5/03."

On January 21, 2004, Dr. Dawson reported that Davis might be able to perform the job of a school bus driver. He signed a job description for the Prince William School District on January 21, 2004, stating that Davis was capable of performing the duties of a school bus driver as of that date.

On February 18, 2004, Dr. Dawson signed a job description for a delivery driver for Flower Gallery, stating that Davis would be capable of performing that job effective March 1, 2004.

On May 3, 2004, Dr. Dawson issued a disability slip stating that Davis was totally incapacitated from May 3 through May 31, 2004. He completed additional disability slips on June 28, July 26, August 23, and September 13, 2004, stating that Davis was totally incapacitated from June 28 through October 11, 2004.

On August 12, 2004, Dr. Francisco Ward, a physiatrist, examined Davis on behalf of the Fund. Dr. Ward also reviewed some of Davis's medical records, including x-rays, emergency room notes, Dr. Dawson's office notes, the FCE, and a prior Independent Medical Examination (IME) report prepared by Dr. John Bruno. Dr. Ward opined that Davis suffered from

"dysfunctional illness behavior" and obesity. He noted that Davis's x-rays showed "OA exaggerated angle lumbosacral joint" and reported that this condition could cause "mechanical back pain" given claimant's obesity "and his sub-optimal posture." Dr. Ward opined that Davis's current symptoms were unrelated to his compensable June 13, 2001 injury by accident, and he concluded that Davis "could easily return to a full job without restrictions."

The deputy commissioner granted the Fund's April 2, 2004 application and suspended Davis's outstanding award of compensation benefits as of April 3, 2004. The deputy commissioner "specifically [found] that the claimant has not cooperated with vocational rehabilitation efforts and that the lack of cooperation amounts to a refusal of vocational rehabilitation." The deputy commissioner found the testimony of Woldanski and Graham "completely credible," and noted that Davis's demeanor showed that he can "easily give the appearance of either engagement or non-engagement with a particular activity." In so ruling, the deputy commissioner made the following findings:

> [A]lthough the medical records indicate that the claimant still has residual pain from his compensable injury by accident, he is not totally incapacitated from work. We find that the claimant had completed an Associate's Degree in Computer Technology; that he has a wealth of experiential backgrounds which make him an attractive candidate for employment; and that the vocational rehabilitation experts have expended an inordinate amount of time and energy attempting to place the claimant in positions well-suited to his residual capacity.

In addition, the deputy commissioner denied Davis's change-in-condition claim, finding that he had failed to sustain his burden of proving a change in condition. The deputy commissioner noted Dr. Ward's IME and the lack of any office notes from Dr. Dawson showing how Davis's condition had changed or deteriorated between May 3, 2004 and October 11, 2004. On review, the full commission affirmed the deputy commissioner's findings.

STANDARD OF REVIEW

"'Decisions of the commission as to questions of fact, if supported by credible evidence, are conclusive and binding on this Court.' . . . 'The fact that there is contrary evidence in the record is of no consequence.'" WLR Foods v. Cardosa, 26 Va. App. 220, 230, 494 S.E.2d 147, 152 (1997) (citations omitted). Moreover, it is well settled that credibility determinations are "within the fact finder's exclusive purview." Goodyear Tire & Rubber Co. v. Pierce, 5 Va. App. 374, 381, 363 S.E.2d 433, 437 (1987).

## ANALYSIS

### I. Failure to Cooperate with Vocational Rehabilitation

"An unjustified refusal to attend an interview or an employee's refusal to cooperate at an interview may constitute an unjustified refusal of employment. . . . Whether an employee is justified in refusing to cooperate with efforts of an employer is a factual finding." United Parcel Service, Inc. v. Godwin, 14 Va. App. 764, 767, 418 S.E.2d 910, 912 (1992) (citing Johnson v. City of Clifton Forge, 7 Va. App. 538, 546-47, 375 S.E.2d 540, 545-46 (1989)).

In affirming the deputy commissioner's decision that claimant unjustifiably refused to cooperate with vocational rehabilitation efforts, the commission found as follows:

> [W]e agree with the Deputy Commissioner's conclusion that the claimant's self-limiting conduct of placing restrictions on the hours he was willing to work, asserting that he was unable to perform certain physical functions during the interview process, failing to obtain transportation to an interview, failing to complete applications or submit employment information in a timely manner, and expressing an overall desire not to be hired constituted sufficient evidence to establish his intention to sabotage the job search. In reaching this conclusion, we recognize that the Deputy Commissioner specifically observed the claimant's ability to appear engaged or disinterested during the course of the hearing. We also conclude that the Deputy Commissioner found the claimant's testimony regarding his efforts to cooperate with vocational rehabilitation to be implicitly incredible, and we defer to her conclusion in this regard. Finally, we defer to the Deputy Commissioner's explicit findings of credibility regarding the

> testimony provided by the claimant's rehabilitation counselors –
> both of whom described the claimant's less than enthusiastic
> efforts to comply with their attempts to find him suitable
> employment.

(Citations omitted.)

The commission's findings are supported by credible evidence, including the testimony of Graham, Woldanski, and Richardelli. Their testimony, which the commission found to be credible, supports its finding that Davis sabotaged the job search to the extent that he unjustifiably refused to cooperate with vocational rehabilitation efforts. As fact finder, the commission was entitled to accept the testimony of Graham, Woldanski, and Richardelli and to reject Davis's testimony to the contrary. Id. Because the commission's decision on this issue was based upon its credibility determination and is supported by credible evidence, we will not disturb it on appeal.

## II. Change in Condition

"In an application for review of an award on the ground of a change in condition, the burden is on the party alleging such change to prove his allegations by a preponderance of the evidence." Pilot Freight Carriers, Inc. v. Reeves, 1 Va. App. 435, 438, 339 S.E.2d 570, 572 (1986). As the commission correctly noted, Davis was required to prove: (1) a change in his capacity to work; and (2) a causal connection between that change and his original compensable injury. King's Market v. Porter, 227 Va. 478, 483, 317 S.E.2d 146, 148 (1984). Unless we can say as a matter of law that Davis's evidence sustained this burden of proof, the commission's findings are binding and conclusive upon us. See Tomko v. Michael's Plastering Co., 210 Va. 697, 699, 173 S.E.2d 833, 835 (1970).

Based upon its review of the medical records, the commission found as follows:

> Dr. Dawson, the claimant's treating physician, continued to believe
> the claimant was capable of restricted duty when he examined the
> claimant in April 2004. Furthermore, although the claimant

- 10 -

submitted Dr. Dawson's disability slips indicating that he became totally incapacitated in May 2004, he has submitted no medical documentation (such as office notes from Dr. Dawson) explaining how his physical condition actually changed or deteriorated so as to prohibit him from any type of work. Nor did the claimant testify that his physical condition changed or deteriorated since April 2004 such that he became incapable of performing any type of work.

In the absence of Dr. Dawson's office notes, other medical documentation showing an actual change in the claimant's physical condition, or testimony from the claimant regarding a change of his physical condition, we agree with the Deputy Commissioner's conclusion that the claimant failed to prove he became totally disabled as a result of his industrial injury beginning on June 28, 2004, and continuing.

The disability slips submitted by Davis were "not necessarily conclusive, but [were] subject to the commission's consideration and weighing." Hungerford Mechanical Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 214 (1991). In light of the lack of credible evidence in the record explaining how Davis's condition changed or deteriorated beginning on June 28, 2004, the commission was entitled to give little or no weight to the disability slips. Thus, we cannot find as a matter of law that Davis sustained his burden of proof, and we will not disturb the commission's decision on this issue.

For these reasons, we affirm the commission's decision.

Affirmed.